UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                                            Docket No 17 Cr. 631 (PAE)

    -v.-

TIFFANY AMPONSAH,
                Defendant.
_____

### DEFENDANT'S SENTENCING MEMORANDUM

The defendant, TIFFANY AMPONSAH, respectfully submits this Memorandum in aid of her plea for leniency at the sentencing hearing to be held on November 8, 2018.

### Objections to the Probation Department Pre-Sentence Report

1. We ask that paragraphs 10 and 11 be removed from the PSR because the drug test did not reveal that any controlled substance was ingested by Ms. Amponsah.

2. Spelling errors: The first lines of paragraph 80 have two spelling errors: Ms. Amponsah was born "Tiffany Gyaa Amponsah" [not Gya], and her mother is Francisca Sarhene [not "Ana Serwan"!].

3. With respect to the "total loss associated with Amponsah" being listed in

the PSR as $431,000 (See paragraphs 53, 63, and 114), while we do not contest that a total loss of this amount may be reflected in the amounts that passed through her bank accounts (although I do not have that information), we note that the amount greatly exaggerates both the gain she actually received personally (which would be estimated at less than $10,000) or her role in the offense, which was very secondary to the persons who ultimately received the money that the victims were tricked into sending to those accounts[1].

## Summary of the Defendant's Sentencing Request

TIFFANY AMPONSAH asks the Court to set a sentence non-custodial sentence, which would be below the Guidelines range found by the Probation Department for the following reasons: 1) her age and vulnerability to being duped by the principal co-defendant in this case, 2) the efforts she has made to make up for her mistakes, 3) the minor amount of financial gain she ultimately received from her participation in the crimes, 4) the fact that she is on a promising educational and career path which will be derailed by a custodial sentence, and 5) the very genuine and complete remorse she feels at having allowed herself to be

---

[1] Just for context we would note that if the loss personally attributable to her were based on what she personally received, and if that amount is less than $10,000, her adjusted offense level would be 10 levels lower than what Probation found, for a guidelines range of 6 to 12 months, in Zone B.

taken in by the charlatans who conceived of and directed the series of frauds which made up the criminal scheme.

As is well-known to the Court, the factors listed in 18 U.S.C. § 3553(a) are as follows:

> (a) Factors To Be Considered in Imposing a Sentence.— <u>The court shall impose a sentence sufficient, but not greater than necessary</u>, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—
>
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>   (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
>   (B) to afford adequate deterrence to criminal conduct;
>
>   (C) to protect the public from further crimes of the defendant; and
>
>   (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner... [Emphasis added.]

We argue that because of the special circumstances in this case, largely based on the defendant herself being victimized by the co-conspirators, a sentence in which Ms. Amponsah is supervised but allowed to continue in her education

and to enter the working world of health care providers (as she has already done) calls out for special consideration.

## The Offense Conduct

Tiffany Amponsah was born and raised in the Bronx. Her parents are from West Africa, so she knew people from West Africa and has traveled to Ghana to visit relatives.

In 2012, while she was still in High School, she met the co-defendant Bernard Adjei and started dating him. When she graduated from High School and he failed to graduate, she broke up with him in 2013, but then they got back together.  She went on to College in Buffalo, New York, but maintained contact with Bernard who started to visit her there. In late 2015, while she was still at college in Buffalo, Bernard asked her if he could use her bank account for transactions, giving her a story about his not having the right credentials to open his own account. He also gave her a story about a cousin who owned a soccer school in Ghana (he showed her photographs of the soccer field in Ghana) and that he was trying to help his cousin by doing bank transfers for him. Tiffany had previously heard that banking transactions to Ghana were difficult for non-U.S. citizens and so the story did not seem unlikely or suspicious. He then started wiring or depositing money into her account and directing her to send it on to

various payees. At one point she opened another bank account to use for these purposes because Chase Bank was suspicious of the wire transfers to Ghana that she requested. Occasionally he had he made cash withdrawals and give him the money. At one point he asked her to withdraw some money and send it to someone by Western Union. At some point he started giving her small amounts (proportional to the amounts of the transactions) to keep for herself, or other times, to "hold" until at some point he might say she can just keep it. Over the time frame of Bernard's scheme she did not receive more than a total of $10,000 that way.

Meanwhile Bernard also asked her, as a favor, to make some calls to people. He would prepare a script of mostly phony biographical information (like where she lives and works) to read in calls to unknown men.[2] At first Tiffany did not associate these calls with any of the banking transactions or with fraud, although she realized it was all a little strange. She was not asked to request money (other than an occasional "birthday present"), but sometimes to say "we should meet up" or things like that (which she later learned was a predicate for requests made for money to travel to a meeting place done by Bernard or his other co-conspirators by email). After seven or eight of these calls she tried to refuse to do it anymore

---

[2]It should be noted that until I (as Tiffany's defense attorney) passed on to the prosecutor that she had made these calls I do not believe that the government was aware that she did so.

thinking that they were strange (although still not really knowing what was wrong with them). Bernard was always present during the calls so that he could make up an answer to some unexpected question if necessary. The scripts became somewhat more elaborate, and she realized there must be some fraud involved, although not exactly how it worked. During this time, Bernard became very secretive about what was on his computer, but at some point she opened his computer and saw that he was going on dating websites. She also eventually figured out that he was using false names (women's names) to communicate with the romance victims, who were men.

While still not knowing what exactly was illegal about what this she confronted him about the strangeness of it and he tried to convince her that the calls were made to somehow help his "brothers," particularly brothers supposedly in Ghana.  Because of his romantic hold over her, however, she continued to make another seven or eight calls before finally refusing to do it anymore near the end of 2016 or the beginning of 2017[3]. Meanwhile the financial transactions continued and she saw that the money was mostly coming from company names and going to the account of the so-called soccer academy and to Bernard's brother "Chris."

---

[3]Note that Ms. Amponsah believes he had other young women making these calls as well, but does not have solid proof of it.

Finally in about March of 2017 (several months after she stopped making the calls) Ms. Amponsah realized that there was a connection between the calls she had made (a total of about 15) and the money that was being run through her accounts. In April, 2017, TD Bank froze the account she had been using and refused to release to her any money in the accounts. At that point she knew for sure that what Bernard was having her do was part of a scheme to defraud people, and that her scripted calls were arranged by Bernard to make it look like the dating site "persona" that he would create was a real female. This was so he could get the male victims of his "romance fraud" to send money for anticipated travel to meet up, or for other reasons that he came up with in his email correspondence with the victims. Despite this realization, however, she continued doing the banking transactions up to some time in May, 2015, when Bernard had to go serve a four-month term on a State Court case involving stolen credit cards for which he had been arrested the prior summer.

While she was extremely disappointed to find out what he was up to she was too frightened to withdraw from the relationship or to report his conduct to law enforcement. She was arrested in July, 2017. Because she had continued to conduct her part in the fraudulent scheme after she fully realized how it worked she accepted her responsibility for her role in the conspiracy and entered into a

plea agreement.

Despite her guilt, however, it should be clear from this history that for most of the time she was involved she was actually being used, and Bernard (and the others) took cruel advantage of her naivete and her love for him to trick her into becoming so deeply involved that she could not see any way out of the quagmire she got herself into.

Attached hereto as **Exhibit A** is a letter from Ms. Amponsah herself. In it she describes her role in the offense, her reasons for getting involved, her chagrin and remorse for that, and her hopes that her career track – for which she has worked so hard (see *infra*) – will not be completely derailed by her misconduct. She concludes by saying, "I so much want to make up for my failures in the past and be as good a person as I can be."

## Prior Criminal Record

Ms. Amponsah has never been convicted of a crime. She got into trouble for minor conduct on two occasions but they did not result in criminal convictions.

## The History and Characteristics of the Defendant

Ms. Amponsah is very much defined by her career ambitions and her educational accomplishments. As the PSR shows, she went to a charter High School, The Bronx Leadership Academy High School, earning her diploma in

2012, while taking medical "terminology" courses at Hostos Community College. She took advanced placement courses while in High School. [PSR, paragraph 91]. During High School and afterward, up until the present, she has worked with "Tender Loving Nannies: in the Bronx, where she has continued to work whenever she is not away at college.  **Exhibit B** is a letter from a supervisor at the agency, Francine Bio, who states that Tiffany has been working with them for six years. Ms. Bio notes that she is "truly a promising employee with great qualities." She goes on to provide specifics of how hard-working she is, how capable she is, and how devoted she is to the children with whom she works. Most of this work is in addition to her attending classes at high school and several community colleges and during breaks from her BA program at the University of Buffalo.

    The work ethic reflected in this letter is completely inconsistent with a person who might have become involved in a fraud scheme because of greed.

    As the PSR shows, Ms. Amponsah has consistently done whatever it takes to improve her knowledge and skills in her chosen field, healthcare. After High School she got her BA in Health and Human Services from the University of Buffalo, which she attended from September, 2012 through May, 2016. During those years she took several individual courses at Erie Community College in Buffalo (Fall semester, 2015), Borough of Manhattan Community College

(Summer quarter, 2015, and again from May, 2018 through September, 2018), and at Cayuga Community College in Auburn, NY, during summer, 2014. PSR paragraphs 88 through 91).

**Exhibit C** is a letter from a school friend, Ashley Vasquez, who is a family friend of over seven years but also a colleague at the University of Buffalo. In addition to the many good qualities Ms. Vasquez describes about Tiffany she also notes that while Tiffany was a student at Buffalo she worked at the University's Child Care Center. Clearly, as this letter and the letter from the supervisor at "Tender Loving Nannies" show, Tiffany has a strong commitment and unusual ability in working with and helping children.

**Exhibit D** is a letter from Tiffany's cousin, Michelle Laryea, who reinforces the good qualities already discussed in this Memo. In addition, the letter talks about the fact that she openly explained how she got into her problems in this case and notes that Tiffany "takes accountability for her actions and hurting those affected." Michelle goes on to say that "She deeply regrets the offense. She understands how this hurt people. I am confident that my cousin learned from this and has grown from this."

Finally, counsel is attaching, as **Exhibit E**, a letter of recommendation to a school from Jessica McDannis, an RN at Montefiore Hospital, who has not been

told about Tiffany's case, but who knows her work ethic and ambition to succeed in the world of health care. Nurse McDannis talks about Tiffany's "extraordinary nursing abilities and creative ideas." She notes that Tiffany is "very involved and hard working" as well as punctual, eager, and desirous of helping people.

Ms. Amponsah (as she notes in her letter, **Exhibit A**) enrolled last month (September, 2018) in an 18-month program in Respiratory Therapy at the Mandl School of the College of Allied Health in Manhattan.

Under separate cover more information will be provided to the Court concerning Ms. Amponsah's attempts to atone for her errors.

In short, however, counsel repeats: Ms. Amponsah's education and work history completely belie any idea that she became involved in the "romance scheme" hatched by her boyfriend Bernard Adjei out of greed. Greed hardly seems to be a motivating factor even in her ambition to succeed in her career: rather it is her love of children and her eagerness to help anyone who needs health care assistance, and her desire to be the best at that calling that she can be, which motivates her to get out of bed every day. She was naive and blinded by love and, just like real victims of this fraudulent scheme, was duped into playing along with whatever her boyfriend asked her to do. Her participation went from being an innocent dupe, to consciously avoiding what she began to realize was the case, to

being too frightened to take steps to stop the scheme (even though she otherwise withheld her participation some time before she was arrested). After she was arrested she immediately accepted responsibility for her conduct and, through counsel, brought some facts to the government's attention that they had not previously known.

## Conclusion

Even throughout the period of the fraudulent scheme Ms. Amponsah continued her education and simultaneous work as a child care-giver and helper in a hospital. None of what she did here had any negative effect on that work.  Ms Amponsah is currently enrolled in a post-bachelor's program in a specialized area of health care, which is consistent with her eagerness to be the best person and best nurse she can be.

We urge the Court to fashion a sentence which will allow her to continue her education and work in the health care field.


Dated:      New York, New York
            October 25, 2018

                                        Respectfully submitted,

                                         /s/ *Thomas H. Nooter*
                                        Thomas H. Nooter
                                        Attorney for Defendant

                                                Freeman, Nooter & Ginsberg  
                                                75 Maiden Lane, Suite 503  
                                                New York, NY 10038  
                                                (212) 608-0808  
                                                Email: nooteresq@gmail.com

cc:    Office of the United States Attorney (by ECF)